U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

OCT 17 2019

CLERK U.S. DISTRICT COURT

By: _____
                    Deputy

UNITED STATES OF AMERICA

v.

No. 4:19-MJ-784

| | |
|---|---|
| JUAN RODRIGUEZ | (01) |
| DAVID JIMENEZ | (02) |
| ALEX MERCADO | (03) |
| JOHN BURGESS | (04) |
| LUIS MARTINEZ | (05) |
| RAUL VILLEGAS | (06) |
| PATRICK HALL | (07) |
| BERNARDO MARTINEZ | (08) |
| ARNOLD MARTINEZ | (09) |
| JACOB GUTIERREZ | (10) |
| LAURENTINO AGUILLON-HERNANDEZ JR. | (11) |
| LAURENTINO AGUILLON-HERNANDEZ SR. | (12) |
| PAUL GARZA | (13) |
| ALFREDO TREJO | (14) |
| MIGUEL SOSA | (15) |
| DIANE FIGUEROA-LOPEZ | (16) |
| THOMAS MARTINEZ | (17) |
| DANIEL MURILLO | (18) |
| CARLOS MORA | (19) |
| PEDRO REBULLOZA a/k/a/ "Pedro Quezada" | (20) |
| MARK ASTORGA | (21) |
| CARLOS DOMINGUEZ | (22) |
| SERGIO AMAYA-MARTINEZ | (23) |
| FELIPE CHAVEZ | (24) |
| JUAN PABLO QUEZADA | (25) |

**Criminal Complaint – Page 1**

## CRIMINAL COMPLAINT

### Conspiracy to Possess with Intent to Distribute a Controlled Substance
(Violation of 21 U.S.C. § 846)

Beginning in or before January 2018, and continuing until in or around September 24, 2019, in the Fort Worth Division of the Northern District of Texas, and elsewhere, defendants **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez, Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada;** along with others known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree to engage in conduct in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), namely to possess with intent to distribute: 50 grams or more of a mixture and substance containing a detectable amount of Methamphetamine; and 100 grams or more of a mixture or substance containing a detectable amount of heroin; and 500 grams or more of a mixture or substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers; a Schedule II controlled substance.

In violation of 21 U.S.C. § 846 (21 U.S.C. §§ 841(a)(1) and (b)(1)(B)).

### Conspiracy to Commit Money Laundering
(Violation of 18 U.S.C. § 1956(h))

Beginning in or before January 2018 and continuing until in and around September 24, 2019, in the Fort Worth Division of the Northern District of Texas, and elsewhere, defendants **Carlos Dominguez,** along with others known and unknown, did knowingly and intentionally conspire and agree with others known and unknown, to commit certain offenses against the United States in violation of 18 U.S.C. § 1956, to wit:

1.     To knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is drug trafficking, in violation of 21 U.S.C. § 846, and 21 U.S.C. §§ 841(a)(l), with the intent to promote the carrying on of specified unlawful activity, that is drug trafficking, in violation of 21U.S.C. § 846 (21 U.S.C. §§ 841(a)(l)),

**Criminal Complaint – Page 2**

and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and

2.    To knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of a specified unlawful activity, that is, drug trafficking, in violation of T21U.S.C. § 846 (21 U.S.C. §§ 841(a)(l)), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, ownership, control and source of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions, represented the proceeds of some form of unlawful activity in violation of 18 U.S.C. § 1956(a)(l)(B)(i); and

3.    To knowingly transport, transmit, transfer, and attempt to transport, transmit and transfer monetary instruments and funds involving the proceeds of specified unlawful activity, that is drug trafficking, as described in this Indictment, in violation of 21 U.S.C. § 846 (21 U.S.C. §§ 841 (a)(l)), from a place inside the United States to or through a place outside the United States knowing that the monetary instruments and funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i). In violation of 18 U.S.C. § 1956(h).

Criminal Complaint – Page 3

I, the undersigned Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## I.    INTRODUCTION

1.    I have been a Special Agent of the Federal Bureau of Investigation (FBI) for nine years and am currently assigned to the Dallas Field Division's Fort Worth Resident Agency on a Criminal Enterprise Squad working with a Violent Crime/Gang Task Force (hereinafter referred to as the Task Force). The Task Force is comprised of agents, investigators and police officers from the FBI, the Arlington, Texas Police Department (APD), Texas Department of Public Safety (DPS), and the Fort Worth, Texas Police Department (FWPD). Prior to my employment with the FBI, I was employed for approximately four years with the Tulsa Police Department, Tulsa, Oklahoma. I also worked for three years with the Webb City Police Department, Webb City, Missouri, and for three months with the Deer Park Police Department, Deer Park, Texas. As a Special Agent, I am charged with the duties of investigating violations of the criminal laws of the United States, including investigating violations of 21 U.S.C. § 841(a)(1) & (b)(1)(B): Distribution and Possession With Intent to Distribute Methamphetamine, Heroin, and Cocaine.

2.    I have participated as a law enforcement officer in investigations of unlawful narcotics distribution and have conducted Title III wiretap investigations, physical and electronic surveillances, undercover transactions, the execution of search and arrest warrants, debriefings of informants, and review of taped conversations and drug records.

Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored and distributed, and the methods of payments for such drugs. I am also familiar with some of the methods by which narcotics traffickers communicate and code words commonly used by narcotics traffickers. I have participated as a law enforcement officer in investigations of money laundering. Through my training, education and experience, I have become familiar with the manners in which individuals promote or conduct specified unlawful activities and conceal or disguise the nature, source, ownership, and control of proceeds of specified unlawful activities.

3.      Mexican criminal enterprises ("MCE") involved in narcotics trafficking accumulate large amounts of U.S. Currency. Due to changes in Mexico's banking laws in 2010, a very limited amount of U.S. Currency can be deposited into Mexican financial institutions. Therefore, MCEs must find ways to deposit cash into their banks.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for a criminal complaint and does not set forth all of my knowledge about this matter. All calls referenced in the complaint are summaries of the intercepted call and are not intended to be a verbatim translation of the call.

5.      This affidavit is submitted in support of a criminal complaint against **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez,**

Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., **Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada;** for a violation of 21 U.S.C. § 846, Conspiracy to Possess with Intent to Distribute and Distribute a Schedule II Controlled Substance, namely methamphetamine, cocaine, and heroin.

6.      This affidavit is submitted in support of a criminal complaint against **CARLOS DOMINGUEZ** for violating 18 U.S.C. § 1956(h), Conspiracy to Commit Money Laundering.

## II.     SUMMARY OF PROBABLE CAUSE THAT A VIOLATION OF 21 U.S.C. § 846 HAS OCCURRED

7.      Since approximately January 2018, the government has been investigating allegations that **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez, Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada; and others** have conspired together to possess methamphetamine, cocaine, and heroin, with the intent to distribute it in the Dallas/Fort Worth area.

Criminal Complaint – Page 6

8.      As part of the conspiracy, **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez, Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada; and others** agreed to possess methamphetamine, cocaine, and heroin with the intent to distribute it, and knowingly and willfully participated in that agreement.

9.      As part of the conspiracy, the common purpose between and among **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez, Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada; and others** was to possess and distribute methamphetamine, cocaine, and heroin in the Dallas/Fort Worth area and elsewhere.

10.     As part of the conspiracy, not every person named or identified in the conspiracy knew every other person identified as being in the conspiracy.  It was their joining together for the common purpose of possessing and distributing methamphetamine, cocaine, and heroin, the nature of the scheme to possess and distribute methamphetamine,

cocaine, and heroin, and the overlapping among its members in possessing and distributing methamphetamine, cocaine, and heroin that established their membership in this particular conspiracy. And not every member of the conspiracy knew the details of each aspect of the conspiracy. Nevertheless, each member of the conspiracy knew or was aware of the conspiracy's general purpose and scope, which was to possess and distribute methamphetamine, cocaine, and heroin in the Dallas/Fort Worth area, between and among **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez, Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada; and others.** As part of the conspiracy, its members had a fluid hierarchy that evolved over time. For example, as some members were arrested or otherwise temporarily unavailable, other members took over the receipt and delivery of methamphetamine, cocaine, and heroin.

11.    As part of the conspiracy, its members routinely received and delivered multiple grams to kilogram quantities of methamphetamine, cocaine, and heroin that they then distributed to others in the Dallas/Fort Worth area.

12.    As part of the conspiracy, some of the money derived from the sale and distribution of methamphetamine, cocaine, and heroin would be used to purchase additional quantities of methamphetamine, cocaine, and heroin.

### III.    SUMMARY OF PROBABLE CAUSE A VIOLATION OF 18 U.S.C. § 1956(h) HAS OCCURRED

13.    Since approximately January 2018, the government has been investigating allegations that **CARLOS DOMINGUEZ** and others have conspired together to conduct financial transactions with proceeds of a specified unlawful activity knowing the transactions were designed to conceal or disguise the source, origin, nature, ownership, or control of the proceeds, in Fort Worth, Texas and Mesquite, Texas .

14.    As part of the conspiracy, not every person named or identified in the conspiracy may have known every other person identified as being in the conspiracy. It was their joining together for the common purpose of possessing proceeds of specified unlawful activity with the intent to send the funds to Mexico by conducting wire transfers in their names and nominee names through money service businesses (MSBs). As well, not every member of the conspiracy knew the details of each aspect of the conspiracy.

15.    Nevertheless, each member of the conspiracy knew or was aware of the conspiracy's general purpose and scope, which was conduct financial transactions with proceeds of a specified unlawful activity knowing the transactions were designed to conceal or disguise the source, origin, nature, ownership, or control of the proceeds in the Fort Worth/ Mesquite, Texas area, between and among **CARLOS DOMINGUEZ** and others.

16.    As part of the conspiracy, **CARLOS DOMINGUEZ** received $5,200 cash from the sale of one kilogram of methamphetamine between himself and a FBI Confidential Human Source (CHS), and then deposited a portion of those proceeds into a bank

account listed in his name at Wells Fargo. In addition, he sent a wire transfer from Western Union using an alias of CARLOS DOMINGUEZ CARRILLO to a beneficiary in Mexico.

17.     As part of the conspiracy, **CARLOS DOMINGUEZ** and others knowingly and willfully agreed to conduct financial transactions with proceeds of a specified unlawful activity knowing the transactions were designed to conceal or disguise the source, origin, nature, ownership, or control of the proceeds.

## IV.     FACTS ESTABLISHING PROBABLE CAUSE THAT A VIOLATION OF 21 U.S.C. § 846 AND VIOLATION OF 18 U.S.C. § 1956(h) HAS OCCURRED

18.     The FBI and the ATF investigators are currently investigating several members of the Sinaloa Drug Trafficking Organization (SDTO) and their associates. The investigation involves a SDTO based in Fort Worth, Texas, involved in the trafficking and distribution of methamphetamine (Ice), heroin, and cocaine in the Fort Worth, Texas area and beyond.

19.     From June 10, 2018, to June 22, 2018, a Confidential Human Source (CHS) conducted consensually recorded conversations with David Jimenez, who was using telephone number XXX-XXX-3630, and Juan Rodriguez, who was using XXX-XXX-7683. During the conversations, the CHS setup a controlled buy of approximately four (4) ounces of methamphetamine (Ice) and a gun through Jimenez from Rodriguez. Jimenez and Rodriguez agreed to sell the methamphetamine for $1,200.00 and gun for $500.00 to the CHS. The transaction was scheduled to occur on June 22, 2018, at Rodriguez's residence, XXXX Mecca Street, Fort Worth, Texas.

20.    On June 22, 2018, the CHS contacted Jimenez and was told to pick-up Jimenez at Buster's Stop and Shop. CHS picked up Jimenez and drove to Rodriguez's residence. Once at the residence, Rodriguez retrieved two four-ounce bags of methamphetamine. Rodriguez thought the CHS was getting one bag and Jimenez was getting the other bag. Rodriguez told the CHS to pick which bag the CHS wanted to purchase. CHS picked a bag and paid Rodriguez. Jimenez did not take the other bag of methamphetamine. Rodriguez then showed CHS a sawed-off shotgun that was for sale but the CHS did not purchase it because the shotgun was jammed and not working properly. Rodriguez told CHS he had several AK-47 rifles for sale but they were priced at $1,000.00 per rifle. The CHS did not purchase a gun but agreed to at a later date. The methamphetamine later field tested positive for the presence of methamphetamine.

21.    Prior to and on June 28, 2018, CHS contacted Rodriguez and setup a controlled buy of an AK-47 style rifle from Rodriguez. On June 28, 2018, CHS went to XXXX Mecca Street, Fort Worth, Texas, and contacted Rodriguez. Rodriguez, who knew CHS had been in prison and was a felon, sold CHS an Zastava, model M92PV, 7.62 caliber pistol, bearing serial number M92PV027493, loaded with 19 rounds of 7.62 caliber ammunition in the magazine of the firearm. During the conversation, CHS asked Rodriguez if Rodriguez could get CHS more ammunition for the firearm since CHS could not buy any. Rodriguez told CHS he could get CHS as many rounds as CHS wanted. CHS paid Rodriguez $1,000.00 for the firearm.

22.    Prior to and on July 26, 2018, CHS setup a nine-ounce purchase of methamphetamine from Juan Rodriguez. CHS was told by Rodriguez to go to XXXX Lancaster Avenue to meet Rodriguez. When CHS arrived at XXXX East Lancaster Avenue, Fort Worth, Texas, he contacted Rodriguez and purchased approximately 266 grams of methamphetamine from Rodriguez. During the transaction, CHS talked to Alex Mercado who worked for Rodriguez. Mercado told CHS Rodriguez had moved his operation to XXXX East Lancaster Avenue because there was too much "heat" at the XXXX Mecca Street location. Mercado was present for the transaction between CHS and Rodriguez and assisted Rodriguez with transferring methamphetamine from one plastic bag to another plastic bag for the CHS. The methamphetamine later field tested positive for the presence of methamphetamine.

23.    Prior to and on August 13, 2018, CHS contacted Rodriguez to setup a controlled buy of a fully automatic rifle from Rodriguez. On August 13, 2018, CHS went to XXXX Mecca Street, Fort Worth, Texas, and contacted Rodriguez. Rodriguez, who knew CHS had been in prison and was a felon, sold CHS a Sig Sauer, model P556, 5.56 caliber short barrel rifle, bearing serial number TP002389. Also included in the purchase was a forty round magazine containing thirty-nine rounds of ammunition and a double drum magazine containing fifty-eight rounds of ammunition. CHS paid Rodriguez $1,500.00 for the rifle. The rifle was not fully automatic as Rodriguez had stated. The barrel of the rifle was approximately 11.5 inches long.

24.    On September 5, 2018, CHS went to Jimenez's residence to discuss purchasing one-half kilogram to one kilogram of methamphetamine (Ice) from Raul Villegas.

While the CHS was at the residence, Jimenez called Villegas. Villegas told Jimenez to give his number to CHS and for the CHS to call Villegas.

25. On September 5, 2018, CHS called Villegas who told CHS to call him on September 6, 2018, to get a price for a methamphetamine purchase.

26. On September 7, 2018, a warrant was issued to monitor the location of Villegas's phone. During the time period of monitoring the location of Villegas's phone, the CHS communicated multiple times with Villegas. During those conversations with the CHS, Villegas advised he was waiting for a load of methamphetamine to be delivered and he would then contact the CHS to setup the purchase of a kilogram of methamphetamine. On a later date, the CHS spoke to Villegas and advised he had a kilogram of methamphetamine to sell to CHS.

27. On October 22, 2018, CHS had arranged the controlled purchase of one kilogram of methamphetamine from Villegas. When the CHS arrived at Villegas's residence, CHS was greeted by an unknown Hispanic male who told CHS they were waiting for the methamphetamine to arrive and Villegas would call CHS when the methamphetamine was delivered. Later that day, CHS spoke to Villegas who told CHS they had sold the five kilograms of methamphetamine that they had and were waiting on another shipment.

28. On October 25, 2018, CHS was provided a phone number by Alex Mercado to call the following day to purchase methamphetamine. CHS arranged a three-ounce methamphetamine controlled buy from Mercado and his SOS.

29.    On October 26, 2018, CHS contacted the telephone number provided by Mercado the day before and spoke to John Burgess. Burgess instructed the CHS to come to Burgess's residence, XXXX Jackson Street, Fort Worth, Texas, once the methamphetamine arrived at his house. Through toll-analysis, investigators observed Burgess in contact with two main numbers in an effort to get the methamphetamine delivered to his house: XXX-XXX-0955 and XXX-XXX-2395. At approximately 6:20 p.m., CHS received a call from Burgess stating the supplier had arrived at his residence. CHS drove to Burgess's residence, XXXX Jackson Street, and purchased approximately three ounces of methamphetamine from Burgess. Investigators observed a dark colored Cadillac arrive and depart from Burgess's residence around the time of the deal. This vehicle was registered to and driven by Luis Martinez.

Investigators believe the telephone number XXX-XXX-2395 was being used by Luis Martinez to communicate with Burgess about the methamphetamine delivery. When investigators retrieved the methamphetamine from CHS, the methamphetamine was wrapped in a latex style glove. Burgess told CHS that the source of supply had wrapped the methamphetamine in the latex glove, in order not to touch it, because the source of supply was on probation. At the time of the deal, Luis Martinez was on federal probation. The methamphetamine later field tested positive for the presence of methamphetamine.

30.    On November 7, 2018, CHS conducted a controlled buy of approximately one kilogram of methamphetamine from Villegas and his source of supply, Miguel Andrade. Prior to the controlled buy, CHS was in contact with Villegas arranging the controlled purchase of methamphetamine.

Criminal Complaint – Page 14

Villegas instructed CHS to go to XXXX Tanneyhill, Fort Worth, Texas to purchase the methamphetamine. When CHS arrived at the meet location, Andrade sold the methamphetamine directly to the CHS. When investigators weighed the kilogram of methamphetamine purchased from Andrade and Villegas, it was 14 grams short of a full kilogram. CHS called Villegas back and was instructed to return to Tanneyhill to make it right. The methamphetamine later field tested positive for the presence of methamphetamine.

31.   On November 7, 2018, CHS returned to XXXX Tanneyhill to pick up the 14 grams of methamphetamine that was shorted from the buy earlier in the day. When CHS arrived Andrade told Patrick Hall to serve CHS. Hall went to a cabinet, retrieved approximately a half kilo of methamphetamine, and weighed out 14 grams. Hall then handed the 14 grams of methamphetamine to CHS.

Once completed, CHS called Villegas to confirm the CHS picked it up. Villegas told CHS he had already spoken to his brother and was aware that CHS had picked up the product. The methamphetamine later field tested positive for the presence of methamphetamine.

32.   On November 20, 2018, CHS conducted a controlled buy of approximately five (5) ounces of methamphetamine from Bernardo Martinez. CHS went to B. Martinez's residence, XXXX Rodeo Street, Fort Worth, Texas, and picked up B. Martinez. CHS drove B. Martinez to Juan Rodriguez's residence at XXXX Mecca Street, Fort Worth, Texas. B. Martinez went into the residence and returned with the methamphetamine. B. Martinez told the CHS that B. Martinez received the methamphetamine from J. Rodriguez.

CHS then drove B. Martinez home. Later in the evening, CHS called J. Rodriguez who told

CHS that he was good with CHS and that J. Rodriguez had several automatic firearms for sale

if CHS was interested in purchasing a gun.

33.    Prior to and on February 6, 2019, a CHS negotiated the purchase of three (3)

kilograms of methamphetamine from Arnold Martinez. A. Martinez sent the CHS to

XXX South Peak Street, Dallas, Texas, to purchase the methamphetamine from Jacob

Gutierrez. When CHS arrived at XXX South Peak Street, Dallas, Texas the CHS

contacted Gutierrez. During their conversation, they both realized there had been a

misunderstanding about the purchase of methamphetamine. Gutierrez was trying to sell

the CHS three (3) kilograms of black tar heroin, not methamphetamine. At the direction

of investigators, CHS tried to negotiate the purchase of a quarter kilogram of black tar

heroin from Gutierrez. CHS entered an office area at XXX S. Peak with Gutierrez. In

front of the CHS, Gutierrez asked Laurentino Aguillon-Hernandez Sr. if they could break

a full kilogram of black tar heroin into smaller quantities. Aguillon-Hernandez Sr. told

Gutierrez no. Gutierrez followed Aguillon-Hernandez Sr. into the shop area to continue

the conversation. Gutierrez returned a short time later and agreed to sell CHS the quarter

kilogram of black tar heroin for $7,500.00. After the agreement was made on the

purchase of the heroin, Laurentino Aguillon-Hernandez Jr. brought the heroin to XXX S.

Peak to sell to the CHS. An unknown male entered the office area and broke the kilogram

of heroin into smaller quantities. CHS provided Gutierrez with the cash for the heroin.

Gutierrez and Aguillon-Hernandez Jr. counted the cash for accuracy and CHS was provided with the quarter kilogram of heroin. The quarter kilogram later test positive for the presence of heroin.

34.     Prior to and on February 14, 2019, the CHS contacted Bernardo Martinez to setup a controlled purchase of a kilogram of methamphetamine. B. Martinez told CHS he could get the kilogram of methamphetamine and that the product would not come from Juan Rodriguez. On February 14, 2019, CHS met with B. Martinez and conducted a controlled purchase of approximately one kilogram of methamphetamine. After the CHS picked up B. Martinez, B. Martinez contacted Paul Garza to purchase the kilogram of methamphetamine for the CHS. Paul Garza had CHS and B. Martinez meet him at a location in north Fort Worth to purchase the methamphetamine; there Garza met up with Alfredo Trejo who took Garza, CHS, and B. Martinez to a local hotel to purchase the methamphetamine. At the hotel, Trejo and Garza met with Diane Figueroa-Lopez and Miguel Sosa, who provided the kilogram of methamphetamine to Trejo. Trejo entered CHS's vehicle and sold the kilogram of methamphetamine to the CHS. After Trejo exited the CHS's vehicle and reentered Garza's vehicle, B. Martinez exited CHS's vehicle and went to the driver's side of Garza's vehicle. Garza provided B. Martinez with money for the sale of the kilogram of methamphetamine to the CHS. B. Martinez reentered CHS's vehicle and they departed the area. The methamphetamine later field tested positive for the presence of methamphetamine.

35.    On February 28, 2019, CHS set up a controlled buy of one kilogram of methamphetamine from Bernardo Martinez. CHS picked up B. Martinez from his residence and drove B. Martinez to XXXX Evans Avenue, Fort Worth, Texas, where they met with Thomas Martinez. Prior to the CHS and B. Martinez arriving at the Evans Avenue address, Bernardo was communicating T. Martinez about the upcoming controlled purchase. Once CHS and B. Martinez made contact with T. Martinez, T. Martinez called another source of supply to get the kilogram of methamphetamine. While waiting for the source of supply to call back, T. Martinez showed CHS and B. Martinez approximately one ounce of methamphetamine that he had for sale. B. Martinez said he had three total ounces but he had sold the other two and what he was showing CHS was all he had left. T. Martinez talked to the source of supply who told T. Martinez he was out of town. The CHS, B. Martinez, and T. Martinez agreed to complete the transaction another day.

36.    On March 5, 2019, CHS set up a controlled buy of one kilogram of methamphetamine from Bernardo Martinez. CHS picked up B. Martinez from his residence. B. Martinez got in the CHS's vehicle.

B. Martinez told CHS that he had talked to Thomas Martinez and T. Martinez was unable to go with B. Martinez to get the methamphetamine, but T. Martinez told B. Martinez his cousin would take B. Martinez and CHS to get the methamphetamine. CHS and B. Martinez went to 4233 Evans Avenue, Fort Worth, Texas, where they met with Daniel Murillo. Once CHS and B. Martinez made contact with Murillo, Murillo got into the CHS's vehicle and told CHS where to drive. On the way to the source of supply's (SOS) location, Murillo used his phone to contact the SOS.

Criminal Complaint – Page 18

The SOS told Murillo he was on his way to his house. CHS, B. Martinez, and Murillo arrived at XXXX NW 28th Street, Fort Worth, Texas. Shortly after they arrived, a black Chevrolet Tahoe driven by Juan Pablo Quezada arrived. CHS, B. Martinez, Murillo, and Quezada all went into the residence where Quezada sold CHS a kilogram of methamphetamine. During the transaction, Carlos Mora was present with Quezada. Mora was acting as security for Quezada during the transaction. Quezada also showed CHS a plastic container containing loose pieces of methamphetamine. Quezada told CHS that Mora had sat on the methamphetamine and crushed it so they put it in the plastic container. The methamphetamine provided to CHS by Quezada later field tested positive for the presence of methamphetamine.

37.    On March 21, 2019, CHS setup a controlled buy of one kilogram of methamphetamine from Bernardo Martinez. B. Martinez was unable to go at the scheduled time so he arranged for the CHS to go to Daniel Murillo's residence to purchase the methamphetamine. CHS went to XXXX Evans Avenue, Fort Worth and purchased the kilo of methamphetamine from Murillo. Prior to the CHS arriving at Murillo's, a black Cadillac Escalade arrived at the location driven by Pedro Rebulloza. Rebulloza delivered the kilogram of methamphetamine to Murillo for the CHS to purchase. Murillo met with the CHS and sold the CHS the kilogram of methamphetamine. After the transaction, Murillo met with Rebulloza and gave money to Rebulloza. After the transaction with Murillo, the CHS met with B. Martinez to pay B. Martinez $1,500.00 for setting up the controlled buy with Murillo and Rebulloza. The methamphetamine later field test positive for the presence of methamphetamine.

38.    On March 29, 2019, at the direction of investigators, CHS arranged a controlled buy of one kilogram of methamphetamine from Arnold Martinez, Gutierrez, Mark Astorga, an unknown Hispanic male courier, and an unknown Source of Supply (SOS) out of Mexico. CHS contacted A. Martinez who told CHS he was unable to go to the deal but CHS could go to Dallas and meet Gutierrez. CHS went to 2818 S. Denley Drive, Dallas, Texas and contacted Gutierrez and Astorga. After contact was made with Gutierrez and Astorga, they all went to 2815 South Denley Drive, Dallas, Texas. This location was Gutierrez and Astorga's residence. While waiting for the methamphetamine to arrive, Astorga and Gutierrez called Astorga's SOS of methamphetamine, who is believed to be in Mexico. The conversation was put on speaker phone so the CHS could hear what was being said. The SOS was coordinating the delivery of the kilogram of methamphetamine by communicating with both Astorga and another unknown subject who was believed to be in the Dallas area. After several phone calls, an unknown Hispanic male (hereafter referred to as UNSUB) arrived at XXXX S. Denley Drive, Dallas, Texas. Astorga made contact with the UNSUB and retrieved the kilogram of methamphetamine. Astorga took the kilogram of methamphetamine to the CHS and completed the transaction with CHS. The kilogram of methamphetamine that was purchased from Astorga and Gutierrez field tested positive for the presence of methamphetamine.

39.    On April 17, 2019, CHS setup a controlled buy of one kilogram of methamphetamine from Felipe Chavez. Prior to the deal, Chavez instructed CHS to go to XXXX Rodeo Street, Fort Worth, Texas to pick up the methamphetamine. CHS went to XXXX Rodeo and contacted Chavez and Bernardo Martinez.

Shortly after CHS arrived, a gray Pontiac sedan arrived, driven by Paul Garza. Chavez

retrieved the money for the methamphetamine from CHS and took it to Garza. Garza

counted the money and then handed the methamphetamine to Chavez. Chavez took the

methamphetamine to the CHS and gave it to the CHS. Before the CHS left, B. Martinez

told CHS both he and Chavez were making money off the sale of methamphetamine to

CHS. CHS departed the location. The methamphetamine later field tested positive for the

presence of methamphetamine.

40.    On May 20, 2019, CHS setup a controlled buy of one kilogram of

methamphetamine from Arnold Martinez and Jacob Gutierrez. CHS had phone

communication with both A. Martinez and Gutierrez during the setup of the transaction.

CHS was instructed to go to XXXX South Denley Drive, Dallas, Texas to meet Gutierrez.

Upon CHS's arrival on Denley, CHS received a call from Gutierrez stating he would be at

the address shortly. A few minutes later, Gutierrez arrived in his brown Chevrolet Tahoe.

Gutierrez instructed CHS to get in the back of Gutierrez's Tahoe.

When CHS entered the Tahoe, CHS was greeted by Aguillon-Hernandez Jr., who was

sitting in the passenger seat of the vehicle. Aguillon-Hernandez Jr. showed CHS the

methamphetamine and handed it to the CHS. CHS handed the money for the

methamphetamine to Gutierrez. Gutierrez divided the money in half and gave half to

Aguillon-Hernandez Jr. Both Aguillon-Hernandez Jr. and Gutierrez counted their stack of

money. CHS then exited the vehicle with the approximately one kilogram of

methamphetamine. The kilogram later field tested positive for the presence of

methamphetamine.

41.    On June 25, 2019, Cooperating Defendant-1 (CD-1) was arrested by a Dallas Drug Enforcement Administration (DEA) task force for possession of approximately 12.8 kilograms of heroin and approximately 6.7 kilograms of methamphetamine. During a debrief of CD-1 on August 16, 2019, CD-1 said on the day CD-1 was arrested by DEA, CD-1 went to XXX South Peak Street, Dallas, Texas, to pick up the heroin and methamphetamine. When CD-1 arrived at the location, he went to the front of the building; there he contacted a 45 to 55 year-old Hispanic male with gray hair who CD-1 later identified as Laurentino Aguillon-Hernandez Sr. CD-1 was told by Aguillon-Hernandez Sr. to go around to the back of the shop. CD-1 drove around to the north end of the shop to get to the back of the shop; there CD-1 was given a box by Aguillon-Hernandez Sr. CD-1 said at the time he did not know how much heroin was in the box. Later, CD-1 looked in the box observed several kilograms of heroin and several kilograms of methamphetamine. DEA took possession of all the heroin and methamphetamine and sent it to their laboratory for further testing.

42.    On June 26, 2019, CHS setup a controlled buy of one kilogram of methamphetamine from Arnold Martinez and Jacob Gutierrez. CHS picked up A. Martinez and they went to 302 Terrace Drive, Dallas, Texas. Gutierrez, Laurentino Aguillon-Hernandez Jr., and Jesus Aguillon-Hernandez (now deceased) were observed getting into a silver Chrysler 300 at XXX Peak Street, Dallas, Texas prior to the deal. Gutierrez, Aguillon-Hernandez Jr. and Aguillon-Hernandez were followed to XXX Starr, Apt 202, Dallas, Texas. From there, they went to XXX Terrace Drive, Dallas, Texas. Gutierrez exited a dark gray Dodge Dart driven by an unknown female.

Criminal Complaint – Page 22

Gutierrez retrieved a bag from the back seat of the Dodge Dart and took it to the CHS. Gutierrez entered the CHS's vehicle and sold CHS the kilogram of methamphetamine that Gutierrez had retrieved from the Dodge Dart. CHS paid Gutierrez for the methamphetamine and Gutierrez gave A. Martinez some money for the transaction. While conducting the deal, Aguillon-Hernandez Jr. and Aguillon-Hernandez drove around the Terrace Drive residence acting as protection for Gutierrez. Gutierrez told CHS the people in the Chrysler 300 were his people watching him because he had been robbed the week before. CHS and A. Martinez departed the location. Gutierrez entered the Chrysler 300 and it was observed going back to the Peak address. Gutierrez, Aguillon-Hernandez Jr., and Aguillon-Hernandez were observed exiting the Chrysler 300 at XXX South Peak Street, Dallas, Texas. The methamphetamine later field tested positive for the presence of methamphetamine.

43.     Prior to and on August 14, 2019, at the direction of investigators, CHS setup a controlled buy of one kilogram of methamphetamine from Bernardo Martinez. The deal was scheduled to occur at XXXX Rodeo Street, Fort Worth, Texas. When CHS arrived at the location, CHS contacted B. Martinez and Sergio Amaya-Martinez. B. Martinez had contacted Amaya to purchase the methamphetamine. Amaya told CHS the methamphetamine would be there shortly. Amaya contacted his source of supply, Carlos Dominguez, several more times, to get an update on when the methamphetamine would be delivered. During the negotiations, Amaya provided CHS with his phone number and Dominguez's phone number.

CHS left but continued to stay in contact with both Amaya and Dominguez reference the

purchase of the methamphetamine. Dominguez told CHS the methamphetamine was on its

way from Houston and would arrive in the Dallas/Fort Worth area shortly. Amaya

confirmed the same information to the CHS. CHS told Dominguez the CHS could

purchase the methamphetamine from Dominguez in a couple days and cancelled the

controlled buy for August 14, 2019.

44.    On August 16, 2019, CHS rescheduled the controlled buy of one kilogram of

methamphetamine from Dominguez that was originally scheduled on August 14, 2019.

CHS went to Mesquite, Texas and met with Dominguez. Dominguez sold CHS

approximately one kilogram of methamphetamine for $5,200.00. The kilogram of

methamphetamine later field tested positive for the presence of methamphetamine.

45.    On August 16, 2019, after the one-kilogram methamphetamine transaction with

CHS, investigators continued to observe Dominguez. At approximately 2:57PM,

Dominguez departed from the parking lot of 18855 Lyndon B. Johnson Freeway,

Mesquite. Investigators followed Dominguez to a Wells Fargo Bank located at 1300

North Town East Boulevard, Mesquite, TX and watched him proceeded to use the

drive thru of the bank. Wells Fargo Bank records indicated that on August 16, 2019,

Dominguez deposited $1,100.00 of cash in Wells Fargo account XXXXXX7097 at

3:17PM. Wells Fargo records show that Dominguez is the sole owner of Wells Fargo

account XXXXXX7097. Investigators witnessed Dominguez leave the bank at

approximately 3:18PM.

As investigators continued to observe Dominguez, he arrived and went into the Check Cashing/Western Union store at 2149 North Town East Boulevard, Mesquite, Texas at approximately 3:28PM. Western Union records indicated that on August 16, 2019 at 4:39est (3:39pm cst), Dominguez purchased a wire transfer of $1,485.00 for a beneficiary in Apatzingan, Mexico. Western Union records revealed that Dominguez sent over $6,000 to Mexico in 2019. Research on the Southwest Border Transaction Record Analysis Center (TRAC) revealed that in addition to the $6,000 of wire transfers sent through Western Union, Dominguez wired over $36,000 from May 6, 2019 to September 8, 2019 to various beneficiaries in Apatzingan, Mexico. Dominguez used three variations of his name and on multiple occasions, structured the wire transfers. Texas Driver's License number XXXXXXXX was issued to Dominguez of XXXX Deen Road, Fort Worth, Texas. Dominguez has used variations of his name including CARLOS DOMINGUEZ CARRILLO & CARLOS Q DOMINGUEZ CARILLO.

46.     Based on my training and experience, I know it is common for Mexico-based drug trafficking organizations to be ran and controlled by the Mexico-based sources of supply/bosses. These Mexico-based superiors direct the U.S.-based conspirators in their distribution of narcotics, the movement of the illegal proceeds to Mexico (in bulk shipment concealed in vehicles or through electronic money remitters), and determine the conspirators' pay/wages. I believe part of Dominguez's responsibility is to launder the DTO's proceeds, as directed by Mexico.

The Affiant believes probable cause exists that Dominguez wired or caused the wiring of more than $42,000 of illegal drug proceeds to Apatzingan, Mexico, from 2018 to present with $36,000 of that being wired from May 2019 to September 2019.    In executing the wire transfers, Dominguez either used his phone number, date of birth, or variation of his name.  On most occasions, Dominguez used his current address as XXXX Deen Rd, Fort Worth, TX for the wires.  In furtherance of the conspiracy, Dominguez transmitted wires to Apatzingan, Mexico. He used wire remitter services (wire remitters) such as Western Union, Continental Exchange Solutions, DolEx, Money Gram, Servicio Uniteller, Inc. among others, to electronically transfer funds from one location to another, and anywhere in the world another wire remitter is located. Wire remitters are often located inside convenience stores.

47.     Prior to and on September 10, 2019, CHS setup a controlled buy of one kilogram of methamphetamine from Sergio Amaya-Martinez.  CHS met Amaya at La Gran Plaza in Fort Worth, Texas to conduct the controlled buy.  Amaya told CHS he was waiting for his unknown source of supply (SOS) to get home from work.  Amaya said as soon as the SOS arrived at his house, the CHS and Amaya would go pick-up the methamphetamine.  While waiting on the SOS, Amaya said he needed to go home for a few minutes.  On his way home, Amaya thought people were following him.  A short time later, Amaya called the CHS to cancel the deal because Amaya thought he was under surveillance.

48.     On and about September 17, 2019, CHS arranged a controlled buy of one kilogram of methamphetamine and the purchase of a gun from Juan Rodriguez.  J. Rodriguez instructed the CHS to go to XXXX Lancaster Avenue, Fort Worth, Texas, to

complete the transaction.  When CHS arrived at XXXX Lancaster, the CHS contacted J.

Rodriguez.  J. Rodriguez provided CHS with approximately one kilogram of

methamphetamine for $5,000.00.  J. Rodriguez showed CHS a pistol that J. Rodriguez

offered to sell to CHS.  J. Rodriguez told CHS he had some additional firearms for sale, to

include a fully automatic pistol, but they were at his mom's house at XXXX Mecca Street,

Fort Worth, Texas.  J. Rodriguez told CHS he would call CHS to meet J. Rodriguez at his

mom's house in about an hour to sell CHS firearms, because he needed to sell two pounds

of marijuana first.  CHS departed the location with the one kilogram of methamphetamine.

CHS later talked to J. Rodriguez on the phone.  J. Rodriguez said it would be awhile

before he could meet because he was still waiting on his marijuana customers.  CHS

cancelled the deal for the firearms.   The approximately one kilogram of

methamphetamine later field tested positive for the presence of methamphetamine.

49.     On and about September 19, 2019, CHS arranged a controlled buy of one

kilogram of methamphetamine from Sergio Amaya-Martinez.  Amaya told CHS to go to

XXXX Freshfield Road, Fort Worth, Texas, to purchase the methamphetamine.  When

CHS arrived at the location, CHS contacted Amaya.  There were several other unknown

males walking around the property.  Amaya sold CHS approximately one kilogram of

methamphetamine for $6,000.00.   Amaya was upset because the $6,000.00 was what it

cost him to purchase the methamphetamine and he was not going to make anything on the

sale to CHS.  At the direction of investigators, CHS told Amaya the CHS would give

Amaya $500.00 in couple of days, for his role in the purchase of the methamphetamine

that day.

**Criminal Complaint – Page 27**

During the transaction, an unknown Hispanic male wearing a Boston Red Sox hat walked toward a building on the property. Amaya inferred that the unknown male was the SOS for the kilogram of methamphetamine. CHS departed with the methamphetamine. The methamphetamine later field tested positive for the presence of methamphetamine.

50.    Based on the foregoing, the Complainant believes that probable cause exists that **Juan Rodriguez, David Jimenez, Alex Mercado, John Burgess, Luis Martinez, Raul Villegas, Patrick Hall, Bernardo Martinez, Arnold Martinez, Jacob Gutierrez, Laurentino Aguillon-Hernandez Jr., Laurentino Aguillon-Hernandez Sr., Paul Garza, Alfredo Trejo, Miguel Sosa, Diane Figueroa-Lopez, Thomas Martinez, Daniel Murillo, Carlos Mora, Pedro Rebulloza,** also known as Pedro Quezada, **Mark Astorga, Carlos Dominguez, Sergio Amaya-Martinez, Felipe Chavez, and Juan Pablo Quezada;** along with others both known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree to engage in conduct in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B), namely to possess with intent to distribute 50 grams or more of a mixture and substance containing a detectable amount of Methamphetamine; and 100 grams or more of a mixture or substance containing a detectable amount of heroin; and 500 grams or more of a mixture or substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers in violation of 21 U.S.C. § 846.

51.    Based on the foregoing, Affiant believes probable cause exists that **CARLOS DOMINGUEZ** along with others known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree to engage in conduct in violation of 18 U.S.C. § 1956(h), namely to conspire with someone else to conduct financial transactions with proceeds of a specified unlawful activity knowing the transactions were designed to conceal or disguise the source, origin, nature, ownership, or control of the proceeds.

_____
Gary J. Koenig
Special Agent
Federal Bureau of Investigation

SWORN AND SUBSCRIBED before me, at 9:25 am/pm, this 17 day of October, 2019, in Fort Worth, Texas.

_____
JEFFREY L. CURETON
United States Magistrate Judge